# In the United States Court of Federal Claims

| | |
|---|---|
| SHARON Y. HART<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 25-1376<br>Filed July 27, 2026 |

Sharon Y. Hart, Štore, Slovenia, pro se.
Elinor J. Kim, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting the government's motion for judgment on the pleadings and denying Dr. Hart's cross-motion for judgment on the pleadings**

Sharon Hart, proceeding without an attorney, seeks Sunday differential pay that she alleges the United States Agency for International Development owes but did not pay her under a personal services contract. The government moves for judgment on the pleadings and asks the court to dismiss the complaint for failure to plausibly allege that USAID was required to pay Dr. Hart at the rate she asserts. Dr. Hart cross-moves for judgment on the pleadings.

The government is correct that neither the contract nor governing law required USAID to pay Dr. Hart the higher Sunday differential pay rate she claims, and neither party disputes that USAID paid Dr. Hart for each Sunday hour she worked at a rate of 25 percent above her basic hourly rate. The court will therefore grant the government's motion and deny Dr. Hart's cross-motion.

## I. Background

Dr. Hart contracted with USAID to serve as a senior education and youth advisor in Amman, Jordan, from February 4, 2024, through February 1, 2025. ECF No. 1-1 at 1, 4. The contract identifies Dr. Hart as an offshore personal services contractor. *Id*. at 1, 3. The contract consists of a cover page, a schedule, and the relevant Agency for International Development Acquisition Regulation (AIDAR) and Federal Acquisition Regulation (FAR) clauses. *Id*. at 1. The contract sets a Sunday-through-Thursday workweek with an expected eight hours per workday. *Id*. at 4.

Article IV of the schedule, titled "Contractor's Compensation and Reimbursement," sets Dr. Hart's position grade at GS-15, step 10. ECF No. 1-1 at 4. It lists an annual basic compensation of $159,950, corresponding to an hourly rate of $76.64. *Id*. The same page includes a table titled "Contract Estimation." *Id*. That table lists seven "Budget Categor[ies]." Some of the line-item budget categories include percentages. The Sunday differential entry lists "25%." *Id.* The table also includes dollar amounts for each budget category in the "Year 1" column. *Id*. It lists "$39,987.50" for Sunday differential. *Id*. The "Total - Contract" is "$243,107.00" for the year. *Id*. The entire table is provided below.

ARTICLE IV -- CONTRACTOR'S COMPENSATION AND REIMBURSEMENT

| | | | | | |
|---|---|---|---|---|---|
| Name | Sharon Hart | | | | |
| Position Title | Senior EDY Advisor | | | | |
| Position Grade | | 15 | 10 | $ 159,950.00 | GS |
| Office | EDY | | | | |
| Period of Performance | 2024-2025 | | | | |
| Funding | PRG | | Hourly rate | $ | 76.64 |

Contract Estimation

| EOCC | Budget Category | | | US$ |
|---|---|---|---|---|
| | Contract Estimation | | | Year 1 |
| 1130008 | Basic Compensation | | | $ 159,950.00 |
| 1150958 | Sunday Diff. | 25% | | $ 39,987.50 |
| 1150958 | Post Diff. | 15% | | $ 23,992.50 |
| 1210408 | FICA | 7.65% | | $ 17,130.65 |
| 1210408 | Health Insurance | | | $ 1,000.00 |
| 1210408 | Life Insurance | | | $ 500.00 |
| 1210408 | Othe Misc. Costs | | | $ 546.35 |
| | Total - Contract | | | $ 243,107.00 |

ECF No. 1-1 at 4.

Article IV then explains some of the line items. ECF No. 1-1 at 4-6. It provides that "a contractor may be eligible for additional pay ... in accordance with the contract clause entitled 'Differentials and Allowances.'" *Id*. at 5 [¶5]. It also describes the table as a "budget," presenting the "total estimated cost budgeted for compensation, fringe benefits, and other direct costs," "calculated to cover the period of February 04, 2024 through February 01, 2025." *Id*. at 5. Article IV labels the total the "Maximum U.S. Dollar Obligation," which "must not exceed $243,107.00." *Id*. at 5; *see also id*. at 1; ECF No. 14-1 at Appx110-11.

Before the parties executed the contract, USAID sent Dr. Hart a nonbinding "Conditional Selection Letter." ECF No. 1-1 at 34. That letter lists "Sunday Premium Pay - currently at the rate of 25%" among the "benefits and allowances" for which Dr. Hart may be eligible. *Id*. The letter also states that USAID grants those benefits and allowances "in accordance with [AIDAR] Appendix D." *Id*.

The parties do not dispute that Dr. Hart worked 224 Sunday hours in 2024 and 32 Sunday hours in 2025, totaling 256 Sunday hours. ECF No. 1-1 at 45-46; ECF No. 11 at 1 [¶3]. USAID paid her $4,910.24 in Sunday differential pay: $4,291.84 for 2024 and $618.40 for 2025. ECF No. 1-1 at 45; ECF No. 14 at 6-7. That is approximately equal to 25 percent of her hourly rate of $76.64 times the total 256 Sunday hours. (Dr. Hart was paid slightly more because her hourly rate increased to $77.30 in 2025. *See* ECF No. 14 at 3 n.4, 7.)

Dr. Hart alleges that USAID miscalculated her Sunday differential pay rate. She reads the "$39,987.50" entry in the table as the amount USAID expected to pay for the full year, assuming eight-hour Sunday workdays every Sunday. ECF No. 1-1 at 46. From that assumption, Dr. Hart derives a rate of $96.12 in differential pay per Sunday hour, by dividing $39,987.50 by 416 total

possible Sunday hours. *Id*. She then multiplies $96.12 by the 256 Sunday hours she worked, yielding $24,606.72. *Id*. After subtracting the $4,910.24 USAID paid her, Dr. Hart seeks an additional $19,696.48 in Sunday differential pay. *Id*.; ECF No. 1 at 2.[1]

In January 2025, Dr. Hart submitted a written claim to the executive office director, Dr. Cynthia Rogers, alleging that USAID had miscalculated her Sunday differential pay. ECF No. 1-1 at 41-42. Dr. Rogers responded that because the contract was not "fixed price," the amount it listed for Sunday differential pay was only a "budget estimate" that "must be in excess so that [USAID] never fall[s] short." *Id*. at 38-39. Dr. Rogers explained that USAID pays contractors Sunday differential pay "under the same terms and conditions that apply to noncommissioned [Foreign Service] Direct-Hire employees." *Id*. at 39. Dr. Rogers added that she could not approve payment above the rate the Office of Personnel Management set. *Id*. at 38.

Dr. Hart later contacted USAID's personal services contract ombudsman. ECF No. 1-1 at 37, 44. She filed this suit in August 2025. ECF No. 1. The government moves for judgment on the pleadings and to dismiss the complaint. ECF No. 14. It argues that the contract required USAID to pay Sunday differential pay at only 25 percent of her basic hourly rate for each Sunday hour worked, resulting in the amount she already received. *Id.* at 2. Dr. Hart opposes and cross-moves for judgment on the pleadings, arguing that the "$39,987.50" entry in the table entitled her to a higher rate, which, when prorated for the actual number of hours she worked, should result in her receiving an additional $19,696.48 in Sunday differential pay. ECF No. 15 at 3.

[1] The government explains that, even though Attachment 6 in Dr. Hart's initial complaint says "415" (ECF No. 1-1 at 46), that was evidently a typo. ECF No. 14 at 12 n.10. The number of Sunday hours per year works out to 52 times 8 equals 416. And, in fact, Dr. Hart's own math works with the number 416, not 415, as $39,987.50 divided by 416 equals Dr. Hart's calculated rate of $96.12 per hour. *See* ECF No. 1-1 at 46.

## II. Discussion

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Contract Disputes Act, Pub. L. No. 95-563, 92 Stat. 2383, 2388 (1978), amends the Tucker Act and provides the court with "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under [41 U.S.C. § 7104(b)(1)] ... on which a decision of the contracting officer has been issued under [the Contract Disputes Act]." 28 U.S.C. § 1491(a)(2).

"[A]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rules of the Court of Federal Claims (RCFC), Rule 12(c). Judgment on the pleadings is appropriate when "there are no material facts in dispute and the party is entitled to judgment as a matter of law." *Forest Laboratories, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

The court applies the same standard it applies to a motion to dismiss for failure to state a claim under the court's rule 12(b)(6). *Jordan v. United States*, 119 Fed. Cl. 694, 697 (2015). A complaint should be dismissed under rule 12(b)(6) "when the facts asserted by the claimant do not entitle [her] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). To avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court will accept well-pleaded factual allegations as true and draw all reasonable inferences in the claimant's favor. *Lindsay*, 295 F.3d at 1257. This court has traditionally held the pleadings of a pro se plaintiff to a less stringent standard than those of a litigant represented by counsel. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (stating that pro se complaints, "however inartfully pleaded are held to less stringent standards

than formal pleadings drafted by lawyers" (marks omitted)). The court has therefore exercised its discretion in this case to examine the pleadings "to see if [the pro se] plaintiff has a cause of action somewhere displayed." *Ruderer v. United States*, 188 Ct. Cl. 456, 468 (1969). Regardless, a pro se plaintiff still has the "obligation to provide the grounds of her entitlement to relief." *Arunachalam v. Apple, Inc.*, 806 F. App'x 977, 981 (Fed. Cir. 2020) (cleaned up).

A breach-of-contract claim requires a valid contract, a duty arising from that contract, a breach of that duty, and damages caused by the breach. *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Here, Dr. Hart must identify a contractual duty requiring USAID to pay her Sunday differential pay at the higher rate that she claims.

Contract interpretation is a question of law. *Banknote Corporation of America v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). The court begins by reading the written agreement "as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id*. "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993). A disagreement between the parties does not itself create ambiguity; both interpretations must be reasonable. *Id*. If the plain meaning of the contract is unambiguous, the court's "inquiry ends, and the plain language of the contract controls." *Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002).

### A. The contract's plain language shows that the "$39,987.50" entry in the table was a budget estimate and did not obligate the government to pay that amount

Dr. Hart argues that the "[c]ontract stipulated [that she] would receive an estimated $39,987.50" in Sunday differential pay. ECF No. 1-1 at 46. Her theory rests on the "Sunday Diff." row in the table, which shows "25%" and "$39,987.50." *Id.* at 4. The table does not explain how

USAID calculated its estimate. *Id*. Dr. Hart reads the entry as part of her compensation package, concludes that it represents the amount she would be owed for 416 hours of Sunday work (52 Sundays at 8 hours each day), then converts $39,987.50 into an hourly Sunday differential pay rate of $96.12. *Id*. at 46. Dr. Hart acknowledges that she worked only 256 of those 416 hours. *Id*. She therefore claims less than the full $39,987.50, seeking $96.12 only for each of the 256 Sunday hours she worked, or a total of $24,606.72 in Sunday differential pay. *Id*. Dr. Hart argues that Article IV's title, "Contractor's Compensation and Reimbursement" (*id*. at 4), together with the table's use of "specific line items and dollar amounts," shows that USAID meant the table to reflect "the compensation framework being offered." ECF No. 15 at 6-7; *see also* ECF No. 18 at 2.

The government responds that the "$39,987.50" entry is "plainly only an estimate." ECF No. 14 at 17. Under the government's reading, the table sets "a ceiling for budgetary purposes, not a promise to pay that amount." *Id*. at 13; *see also* ECF No. 16 at 2; ECF No. 1-1 at 39 (Dr. Rogers at USAID explaining to Dr. Hart that "[t]he budget in the contract is a budget estimate to ensure sufficient funds are obligated. It is a maximum number. The budget must be in excess so that we never fall short.").

The government is correct. The contract, read as a whole, presents the table as a budget, and its line items accrue only as the contract's clauses provide. ECF No. 1-1 at 4-6. The contract's plain language shows that the "$39,987.50" entry estimates USAID's maximum cost exposure for Sunday differential pay. *Id*. at 4. That value did not promise Dr. Hart any specific amount as fixed compensation or set her hourly rate for Sunday differential pay at $96.12 per hour. The table itself is titled "Contract Estimation." *Id*. It then includes the labels "Budget Category" and "Contract Estimation" as categories covering all of the line items. *Id*. Both of those labels show that the "$243,107.00" total is the government's budget and estimate, and that each line item included in

that total is part of the budget and estimate, not that the government is guaranteeing a particular total payment for each line item to Dr. Hart. The table identifies "Sunday Diff." as one of the line-item "Budget Categor[ies]." *Id*. The text following the table in Article IV likewise calls the "total estimated cost" a "budget" and states that the total is the agency's estimate of all costs and the "maximum U.S. dollar obligation under [the] contract." *Id*. at 5; *see also* ECF No. 14-1 at Appx110-11 (stating that a requesting officer "must prepare a comprehensive budget" as an "estimate of all costs associated with the individual [contract].").

There is at least one entry in the table that is not a sum that Dr. Hart would be paid directly. The table includes "FICA" (Federal Insurance Contributions Act), which is an expense incurred by USAID but not a payment to Dr. Hart. ECF No. 1-1 at 4. Article IV explains that USAID deducts tax and FICA withholdings and covers the employer FICA contribution. *Id*. at 5 [¶3]. Thus, Dr. Hart's conclusion that all table entries were supposed to be direct compensation to her (*see* ECF No. 15 at 7-8) is not quite correct.

The table also includes insurance amounts. ECF No. 1-1 at 4; *see* 48 C.F.R. ch. 7, Appx D ("AIDAR, Appendix D," available at ECF No. 14-1 at Appx3). The insurance line items allow Dr. Hart to receive reimbursement for her "actual costs" up to a certain amount. *See* ECF No. 1-1 at 17-19. The life insurance line item, for example, provides for a reimbursement of "up to 50% of actual annual life insurance costs," capped at $500 per year. *Id*. at 18 [¶2]. The table therefore includes USAID's maximum insurance reimbursement, given to Dr. Hart only if she incurs the cost. Reading the contract as a whole, the Sunday differential entry should be interpreted similarly, as a maximum, not as a fixed obligation. *See Banknote*, 365 F.3d at 1353.

Article IV likewise refers to "the allowable costs above" in reference to the budget presented in the table. ECF No. 1-1 at 6. It explains that USAID will pay Dr. Hart for "necessary and

reasonable costs actually incurred in the performance of the contract, as described in the allowable costs above." *Id*. The contract clauses on the pages following the table determine what USAID owes for each category. *See id*. at 5-6, 15-18.

The surrounding "Budget" and "Estimation" references unambiguously limit the scope of the "$39,987.50" term to an approximation and a maximum, not an actual compensation total. *See* ECF No. 1-1 at 4-5; *see also Evie's Catering, Inc. v. United States*, 126 Fed. Cl. 562, 564 (2016) (explaining that "contract terms that are qualified as an 'estimate' are ... unambiguous and non-binding"), *aff'd*, 680 F. App'x 1015 (Fed. Cir. 2017). And the contract makes clear that USAID would only reimburse compensation and costs Dr. Hart "actually incurred in the performance of the contract." ECF No. 1-1 at 6. If Dr. Hart were entitled to the total Sunday differential pay estimate as a fixed sum, her compensation would not depend on costs "actually incurred." *Id*. Interpreting the Sunday differential entry as an obligated sum would render those terms meaningless. "[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983).

The contract also incorporates FAR 52.232-20, "Limitation of Cost." ECF No. 1-1 at 31. Under that provision, "the estimated cost shown in the contract constitutes a ceiling on the government's contractual liability." *Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 310 (Fed. Cir. 1997); *see also* 48 C.F.R. § 52.232-20(d)(1) ("The Government is not obligated to reimburse the Contractor for costs incurred in excess of ... the estimated cost specified in the Schedule"). Dr. Hart acknowledges that the contract describes the total as the "Total *Estimated* Cost" and "*maximum* obligated amount." ECF No. 18 at 2, 3 (emphasis added).

The court sympathizes with Dr. Hart's argument that the government, by significantly overestimating her Sunday differential pay, presented a confusing compensation structure (ECF No. 15 at 2, 7-8). USAID provided a large maximum estimate for Sunday differential pay, without explaining how it reached that number. *See* ECF No. 1-1 at 4. USAID likely provided the estimate because the agency could not predict how many Sunday hours Dr. Hart would actually work. Thus, the contract lists Sunday differential as an anticipated cost and shows that that cost contributes to the total estimate. *Id*. USAID appears to have reached its $39,987.50 budget based on an impossible scenario in which Dr. Hart would work all of her "forty (40) hours each week" only on Sundays. *Id*. ($39,987.50 equals 25 percent of the $159,950 "Year 1" "Basic Compensation" entry, the premium USAID would owe Dr. Hart if each of her work hours for the year fell on a Sunday); *see also id*. at 39 (stating that the budget "must be in excess so that [USAID] never fall[s] short").

Dr. Hart argues that the government's interpretation "read[s] the Sunday Differential entry out of the contract altogether." ECF No. 18 at 2; *see also* ECF No. 15 at 7 (arguing that "all other components of the compensation structure were honored, and only the Sunday Differential was later recharacterized as a mere estimate"). But contrary to her argument, the Sunday differential pay estimate is necessary under the government's interpretation of the contract (ECF No. 16 at 2). The government's interpretation obligates USAID to budget enough funds to cover Sunday differential pay, whatever number of Sunday hours Dr. Hart would later work. USAID paid Dr. Hart Sunday differential pay, at a rate of 25 percent of her hourly rate, for the Sunday hours she worked. *See* ECF No. 1-1 at 45; ECF No. 14 at 6-7. The parties dispute how much Sunday differential pay the contract required, not whether it required any.

In fact, even under Dr. Hart's own argument, the contract did not obligate USAID to pay her the entire amount budgeted. Dr. Hart requests less than the entire $39,987.50 in differential

pay. ECF No. 1-1 at 46 (arguing that she "should have been paid a total of $24,606.72" in Sunday differential pay); ECF No. 1 at 2 [¶A]. She argues that she is eligible for Sunday differential pay only for the Sunday hours she worked, seeking a prorated amount for only the 256 Sunday hours she worked. ECF No. 1-1 at 46. That partially undermines her argument that she accepted USAID's offer and performed the contract in reliance on the "specific percentage and dollar amount" USAID listed for Sunday differential pay in the contract (ECF No. 15 at 5). It likewise undermines Dr. Hart's argument that her pay was not an hourly rate but instead the total compensation as set forth in the table (*id*. at 3).

Nothing in the contract's text converts the "$39,987.50" entry into additional hourly pay. That entry only guarantees that USAID has budgeted enough funds to cover Sunday differential pay for whatever schedule Dr. Hart ends up working.

### B. The contract and controlling regulations set Sunday differential pay at 25 percent of Dr. Hart's basic pay rate

There are at least three independent sources capping Dr. Hart's Sunday differential pay rate at 25 percent of her basic pay rate: (1) the contract Dr. Hart signed includes a 25 percent Sunday differential pay rate; (2) the conditional selection letter describing the position sets out a 25 percent Sunday differential pay rate; and (3) the contract expressly incorporates the AIDAR and FAR clauses tying personal services contractors' Sunday differential pay to USAID's rate for direct-hire employees, which is capped at 25 percent of an employee's basic pay rate.

First, the estimation table in the contract Dr. Hart signed lists "25%" in the "Sunday Diff." row. ECF No. 1-1 at 4. The same page identifies Dr. Hart's basic hourly rate at "$76.64." *Id*. Reading those entries together, the contract provides a Sunday premium of 25 percent of $76.64, or $19.16 for each qualifying Sunday hour. Under Dr. Hart's interpretation, however, she would be entitled to a Sunday differential rate that is 125 percent of her basic pay rate, resulting in her

receiving a total of 225 percent of her basic pay for Sunday hours worked. That contradicts the "25%" rate stated in the Sunday differential pay row. *Id*.

Second, USAID sent Dr. Hart a nonbinding conditional selection letter describing Sunday differential pay "currently at the rate of 25%" among the benefits and allowances granted "in accordance with [AIDAR] Appendix D." ECF No. 1-1 at 34. The letter gave Dr. Hart notice of USAID's interpretation, because it lists the Sunday differential pay rate as 25 percent. And because the letter does not mention $39,987.50, the only logical interpretation is that it was 25 percent of her basic pay rate.

Third, the contract incorporates the AIDAR and FAR clauses requiring Dr. Hart's Sunday differential pay rate to follow the terms applicable to direct-hire employees. The cover page states that the "contract consists of this Cover Page, the Schedule and AIDAR and FAR Clauses," and that the parties' "rights and obligations" "shall be subject to and governed by the Schedule and the AIDAR and FAR Clauses." ECF No. 1-1 at 1-2. The FAR defines USAID's Automated Directives System (ADS), which "sets forth the Agency's policies and essential procedures." 48 C.F.R. § 702.170-1 (2014); *see also* ECF No. 14 at 5 n.7. Under the ADS chapter governing personal services contracts, each group "has the option to authorize Sunday Pay" for contractors, and any authorized Sunday pay "must be paid under the same terms and conditions that apply to non-commissioned [Foreign Service] Direct-Hire employees who receive Sunday Pay." ADS 309, *Personal Services Contracts with Individuals*, § 309.3.2.2 (Oct. 31, 2023) (available at ECF No. 14-1 at Appx134). The group exercised that discretion here—noted in the table, which budgets for Sunday differential pay—and USAID paid it. ECF No. 1-1 at 4, 45. Sunday differential pay is therefore available under the contract only as USAID policy authorizes it, on the terms that apply to direct-hire employees.

The terms governing direct-hire employees set their Sunday differential pay rate at 25 percent of basic pay for each Sunday hour. ADS 472 directs USAID to administer Sunday differential pay for direct-hire employees under a provision, titled "Sunday Premium Pay" that incorporates 5 C.F.R. § 550.171(a). ADS 472, *Premium Compensation* (June 9, 2017) (available at ECF No. 14-1 at Appx150, incorporating "3 FAM 3136"); *see* 3 FAM 3136 (available at ECF No. 14-1 at Appx163, incorporating "5 C.F.R. § 550.171(a)"). Under that regulation, direct-hire employees receive Sunday differential pay "at a rate equal to 25 percent of his or her rate of basic pay for each hour of Sunday work." 5 C.F.R. § 550.171(a) (2015). Thus, like her direct-hire-employee counterparts, Dr. Hart is entitled to Sunday differential pay at 25 percent of her basic pay rate. *See* ADS 309, *Personal Services Contracts with Individuals* (available at ECF No. 14-1 at Appx134).[2]

### C. USAID paid Dr. Hart the 25 percent Sunday differential pay the contract required, so she has no further claim

Dr. Hart was entitled to differential pay of 25 percent of her basic hourly rate for each Sunday hour worked. The parties do not dispute that Dr. Hart worked 256 Sunday hours. ECF No. 1-1 at 45, 46; ECF No. 14 at 7. Nor do they dispute that her basic hourly compensation rate was $76.64 in 2024 and $77.30 in 2025. ECF No. 1-1 at 4; ECF No. 14 at 3 n.4, 7. At 25 percent, those rates yield Sunday premiums of approximately $19.16 and $19.36 per hour, so Dr. Hart was entitled to Sunday differential pay of $4,291.84 for 2024 and $618.40 for 2025, a total of $4,910.24. USAID paid her $4,910.24 in Sunday differential pay. ECF No. 1-1 at 45-46. Because USAID

[2] To the extent that the $39,987.50 figure in the contract presented an ambiguity in light of the "25%" number and other references to 25 percent of her basic pay rate, the ambiguity was patent, or evident on the face of the contract, because that dollar amount is not 25 percent of her hourly rate. Thus, even if the contract is considered ambiguous, Dr. Hart was obligated to clarify before signing the contract. *See NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) (explaining that a patent ambiguity is one that is "obvious, gross, [or] glaring" and that it "triggers a duty to inquire").

paid Dr. Hart the Sunday differential pay owed under the contract, Dr. Hart cannot plausibly allege a breach of contract.

## III. Conclusion

The government's motion for judgment on the pleadings (ECF No. 14) is **granted**, and Dr. Hart's cross-motion (ECF No. 15) is **denied**. The complaint is dismissed. The clerk of the court shall enter judgment and award no costs.

**IT IS SO ORDERED.**

/s/ Molly R. Silfen
MOLLY R. SILFEN
Judge